IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| | * | |
| | * | **Criminal Case No.: SAG-21-0286** |
| v. | * | |
| | * | |
| **FRED PRIMUS,** | * | **UNDER SEAL** |
| | * | |
| **Defendant.** | * | |
| | * | |

* * * * * * * * * *

**<u>MEMORANDUM OPINION</u>**

This case involves a complex narcotics conspiracy. The Government originally charged eleven defendants but nine have pleaded guilty, leaving just two defendants awaiting trial this fall. Currently pending before this Court is a motion filed by Defendant Fred Primus to suppress wiretaps and derivative evidence. ECF 450. Mr. Primus challenges the admissibility of derivative evidence obtained from four wiretaps by arguing that the four affidavits lacked probable cause and a sufficient showing of necessity. This Court has reviewed the motion, the opposition and reply, and the relevant wiretap affidavits, and has considered the arguments presented at the motions hearing on June 14, 2024. ECF 476, 482, 492, 491-1, 492, 492-3. Mr. Primus's motion will be DENIED for the reasons set forth herein.[1]

I.   PROBABLE CAUSE

　A.  Legal Standards

The probable cause standard employed in a wiretap context is the same used in other contexts, including that needed "to obtain the issuance of a search warrant." *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983). The Supreme Court has defined "probable cause" as

---

[1] The parties will have one week to review this memorandum opinion, confer, and jointly suggest redactions that should be made before this opinion is publicly filed.

requiring "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act,'" and has noted that it is a "practical and common-sensical standard." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (alteration in original) (quoting *Illinois v. Gates*, 461 U.S. 213, 231, 238 (1983)).

In reviewing a wiretap, this Court does not review the existence of probable cause *de novo*, but simply looks to see whether there was a "substantial basis" for the issuing court to find probable cause. *Gates*, 462 U.S. at 238–39. The "substantial deference" accorded to the issuing judge's findings means that this Court must simply "decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992) (internal quotation marks and citation omitted).

### B.  Basic Factual Background Relating to TT2

Mr. Primus challenges wiretaps on two different target telephones in this case, TT2 and TT5. The wiretap activity in this case began on January 8, 2021, when U.S. District Judge James K. Bredar authorized interception of TT1, a phone believed to be used by Kevin Fuller, a "known, upper-level drug distributor." ECF 492 ¶ 28. Back in April of 2020, a confidential source ("CS-4") told investigators that Fuller's supplier was "Ron," who drove a white Honda with Maryland tag 37557CJ. *Id.* ¶ 35. Investigators confirmed that the vehicle bearing that tag was registered to Ronald Francis White Jr. *Id.* n.4.

In September, 2020, CS-4 conducted a controlled purchase from Fuller at his shop, Success Auto Sales at 5420 Reisterstown Road. *Id.* ¶¶ 29, 64. During the transaction, Fuller was on his cellphone. *Id.* ¶ 64. About one hour later, White showed up at 5420 Reisterstown Road in his white Honda and engaged in a private conversation with Fuller. *Id.* Another hour later, a third

individual arrived at 5420 Reisterstown Road, retrieved what appeared to be CDS from the trunk of his car, and handed it to Fuller, who then handed it to CS-4. *Id.* CS-4 turned over the substance to investigators, and it tested positive for heroin and fentanyl. *Id.*

On January 20, 2021, the wiretap on TT1 revealed a conversation between Fuller and TT2, which was a phone "believed to be used by WHITE." *Id.* ¶ 66. During the call, the parties engaged in conversation about meeting and Fuller stated, "you can come to the apartment and then call yo and see what he want to do tonight." *Id.* Shortly thereafter, Fuller on TT1 called another unknown male and stated, "You think Yo gonna want that?" and "I'm getting ready to talk to yo in about five minutes." *Id.* ¶ 68. The unknown male confirmed that "Yo" would "want that" "tomorrow." *Id.*

The next day, January 21, 2021, at 4:46 p.m., the user of TT2 asked Fuller where he was and said he would meet Fuller "at the shop." *Id.* ¶ 70. At 4:58 p.m., Fuller received a call from someone, believed to be a drug customer, stating that he had someone that wanted "One and a half." *Id.* ¶ 73. At about 5:20 p.m., Fuller texted the user of TT2, who was on his way to "the shop," to state "Got to make a run Playboy." *Id.* ¶ 72. At about 5:26 p.m., the user of TT2 called Fuller and they realized that they were crossing paths and planned how they would meet up in person. *Id.* ¶ 74.

### C. Analysis

#### 1. Affidavit #1 (2/5/2021 for TT2)

Mr. Primus's primary contention with respect to this affidavit is that the investigators did not include a sufficient factual basis to identify Ronald White as the likely user of TT2. This Court agrees that the affiant did not provide facts to draw an express link. Nevertheless, under the deferential standard of review employed in this context, the affidavit still contains sufficient

probable cause to justify the issuance of a wiretap on TT2. The calls and messages between Fuller and the user of TT2, in combination with the surrounding exchanges between Fuller and his customers, create probable cause to believe that the user of TT2 is Fuller's drug supplier. That probable cause is corroborated by the toll analysis on TT2s telephone calls, which revealed a "large volume of daily calls lasting less than one minute" which "is indicative of an individual involved in the distribution of controlled dangerous substances." ECF 492 ¶ 106. Further, the affidavit details extensive contacts between the user of TT2 and at least one individual who is a known drug dealer, Keith Waller. *Id.* ¶ 108.

Thus, while the affidavit may not have contained facts to illustrate a direct link between White and TT2, positive identification of a phone's primary user prior to a wiretap is not required. Even if all of the information regarding White is disregarded, the affidavit contains probable cause to believe that the user of TT2 is Fuller's narcotics supplier, justifying the wiretap. In addition, the issuing judge had a substantial basis to connect White to TT2 through logical inference from two separate sets of facts: (1) White is Fuller's drug supplier (based on the information provided by CS-4 in April, 2020 and the observations of the controlled purchase in September, 2020); and (2) the user of TT2 is Fuller's drug supplier (based on the information intercepted over TT1 in January, 2021), leading to the reasonable inference that the user of TT2 is White. The affidavit, therefore, contains sufficient probable cause to justify the wiretap Judge Bredar issued.

   2. **Affidavit #2 (2/25/2021 affidavit for TT5)**

TT5 is a phone used by Mr. Primus himself. Mr. Primus challenges the affidavit dated February 25, 2021, submitted to authorize a wiretap on that phone, arguing that (1) the background characterizations of Mr. Primus lack factual support and (2) the quoted

conversations intercepted over TT2 contain no explicit references to drugs or drug sales. This Court is not persuaded by either contention.

Mr. Primus objects to the general characterizations summarizing information from earlier investigations about Mr. Primus's drug activities, including investigations in other jurisdictions. Standing alone, this Court would agree that such characterizations lacked sufficient specificity to create probable cause. But Judge Bredar did not have to rely on those characterizations to find probable cause in this case because the affidavit included intercepted conversations between White, using TT2, and Mr. Primus, using TT5. *See* ECF 492-1 ¶¶ 49–53. A common-sense review of those interceptions suggests that White obtained a quantity of narcotics from Mr. Primus and his source of supply at the Maryland Live! Casino and then reached out to a number of his drug customers to sell those narcotics. Casino footage showed the source of supply arriving at the casino hotel with a large duffel bag and confirmed that the three met up in their rooms. *Id.* ¶¶ 52–53. Intercepted calls revealed White, in this same time frame, contacting known drug dealers and making arrangements to meet. *Id.* ¶ 53. While Mr. Primus correctly notes that the parties do not mention drugs by name, coded and vague discussions (including a preference for in-person conversations) are common in the drug trade. The conversations intercepted in this case, along with the video evidence, corroborate the version of events advanced by the investigators and provide probable cause for the initiation of the wiretap.

### 3. Affidavit #3 (3/5/2021 for TT2) and Affidavit #4 (4/1/2021 for TT2)

Before these two attempts to reauthorize the wiretap on White's phone, the investigators had combined the prior interceptions with surveillance and had positively identified White as the user of TT2. Mr. Primus's challenges to these affidavits, then, focus on the fact that the conversations intercepted over TT2, summarized in these two affidavits, did not explicitly

reference drugs or drug sales. Particularly under the deferential standard of review this Court must employ, Mr. Primus's argument is unpersuasive. The issuing judge is supposed to employ a common sense, practical approach and is not supposed to view each intercepted statement in a vacuum. By the time of these affidavits, the investigation had been underway for months and the investigators had collected significant evidence that White and the others involved in these transactions were participants in a narcotics conspiracy. The intercepted calls and messages contained cryptic discussions about meeting (for what generally proved to be brief periods of time) in store parking lots and other random locations, conduct consistent with narcotics trafficking. *See* ECF 492-2 ¶¶ 79–82. Drug traffickers (particularly those, like White and his co-conspirators in this case, who appear savvy in terms of avoiding apprehension) rarely discuss narcotics openly in telephonic messages. Applying a common-sense approach, then, the issuing judge had a substantial basis for concluding that the investigators had probable cause to reinitiate or to continue interception of TT2.

## II.   NECESSITY

### A.  Legal Standard

When seeking wiretap authorization, in addition to probable cause, the Government must make one of two alternative showings: either that "other investigative procedures have been tried and failed" or that those other investigative procedures "reasonably appear to be unlikely to succeed or to be too dangerous." 18 U.S.C. §§ 2518(1)(c), 3(c). This requirement to show "necessity" does not require that law enforcement officers "exhaust every conceivable technique before making an application for a wiretap." *United States v. Clerkley*, 556 F.2d 709, 715 (4th Cir. 1977). In fact, the Government's burden is "not great, and the adequacy of such a showing is to be tested in a practical and commonsense fashion that does not hamper unduly the

6

investigative powers of law enforcement agents." *United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007) (quoting *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994)). The showing must be case-specific and not "a mere boilerplate recitation of the difficulties of gathering useable evidence." *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995) (internal quotation marks and citation omitted).

### B. Analysis

This Court will generally address the Government's efforts to show necessity in this case, as its recitation remained largely consistent throughout the four affidavits (and because the earlier affidavits are incorporated into the later ones). Applying the governing standards in the Fourth Circuit, the four wiretap affidavits at issue demonstrate the requisite necessity. They run through a list of ten alternative investigative techniques and explain either why the use of the technique failed to reach the goals of the investigation or why the technique cannot be used. For example, in the first affidavit at issue, the Government reviewed the following alternative techniques:

- PRIOR WIRE INTERCEPTS: The Government explains that prior wire intercepts were used but have not yet identified all the members of the conspiracy, its customers, its sources of supply, or all of the locations it used. ECF 492 ¶¶ 123–25.

- CONFIDENTIAL SOURCES: The Government explains that three confidential sources have been used but because they are drug purchasers, they would not be capable of meeting the higher-ups in the organization and have limited connections to certain conspiracy members. *Id.* ¶¶ 126–28.

- UNDERCOVER OFFICERS: The Government explains that undercover officers have not been used in this case because the targets appear unwilling to deal with unknown individuals and do not operate "street-shops." *Id.* ¶¶ 129–31.

- PHYSICAL SURVEILLANCE: The Government explains that surveillance has been used in the case, but the main location, Fuller's auto repair shop, is on a busy roadway and is difficult to surveil without being spotted. Also, members of the conspiracy have engaged in counter-surveillance and have altered their activity when they believe law enforcement is in the area. *Id.* ¶¶ 132–35.

- OTHER SURVEILLANCE METHODS: The Government explains that there are no BPD CCTV cameras near Fuller's auto repair business. Investigators did install a pole camera in front of the auto body shop, which has helped to identify vehicle license plates, but it does not allow the investigators to know which visitors are there for legitimate transactions and which are narcotics customers. Investigators also installed a surveillance camera in front of a co-defendant's residence and obtained some useful footage, but largely by combining the camera footage with the wiretap interception on TT1. *Id.* ¶¶ 136–42.

- TELEPHONE TOLL RECORDS/PEN REGISTERS: The Government explains that such telephone records have been used in the investigation to draw connections but they cannot reveal who is using the phones or what is being said. *Id.* ¶¶ 143–45.

- GRAND JURY/WITNESS INTERVIEWS: The Government explains that the witnesses currently assisting in the investigation have limited knowledge of the scope of the conspiracy. Those who would be most helpful are the conspiracy participants themselves, who could not be compelled to self-incriminate. And conducting interviews would alert the targets of the investigation to its existence, likely hindering investigative efforts. *Id.* ¶¶ 146–48.

- SEARCH AND ARREST WARRANTS: The Government explains other than an earlier warrant in a related investigation, warrants had not been used yet in this case because investigators were still trying to acquire addresses and develop probable cause. Even for the few locations that investigators already had probable cause to search, the search warrants would simply alert the targets to the investigation and hamper efforts to achieve investigative goals. *Id.* ¶¶ 149–52.

- TRASH RUNS: The Government explains that Fuller lives at an apartment complex with a community dumpster and Success Auto has no visible outside dumpsters. Accordingly, trash runs had not been used because no bags of trash could be readily identified. *Id.* ¶¶ 153–54.

- CURRENT PARALLEL INVESTIGATIONS: The Government explains that other ongoing investigations had provided limited information about some players in the conspiracy but had not met the entirety of the investigative goals. *Id.* ¶ 155.

Thus, the Government provided a fact-based summary of its alternative investigative techniques in this case, with a discussion of why other techniques would be dangerous or ineffective. Mr. Primus's argument appears to be that because, in many, if not most, narcotics conspiracy cases, law enforcement needs to resort to wiretapping to complete an exhaustive investigation, the assertions of the deficiencies in other techniques become boilerplate and are

not sufficiently case-specific. This Court disagrees. Certain facts and limitations are common to almost every narcotics conspiracy investigation. For example, seeking to interview the target or his close associates early in the investigation is generally counterproductive because it would reveal the involvement of law enforcement. Similarly, review of telephone toll records can establish which phones are in contact with one another but cannot identify the users of the phones. These universally true facts apply in all cases but do not make them boilerplate or overly generic. Particularly under the deferential standard of review applicable here, this Court finds no issue with the Government's recitation of necessity in the four affidavits in this case.

Finally, this Court rejects the notion that the Government set the goals of its investigation simply in order to manufacture necessity to use a wiretap. When the Government brings criminal charges against a defendant, it bears the burden of proving its case beyond a reasonable doubt. To meet that daunting standard, the Government must conduct a thorough and comprehensive investigation and must ensure that it knows as much as it can about each defendant's course of conduct. Narcotics conspiracies are complex and often secretive. Co-conspirators are often wise to available investigative techniques and use counter-surveillance to evade detection. The fact that the Government may frequently seek the same type of information about a given narcotics conspiracy, to include the totality of its membership, its sources of supply, and as much information as possible about its conduct, is a reflection of what the Government needs to prove in such cases to achieve convictions, not simply a ploy to be able to use a wiretap. In this case, the Government set legitimate investigative goals and explained why it needed to use these wiretaps to meet its goals. Its showing of necessity provides no basis for suppressing the evidence it gleaned or derived from these four wiretaps.

### III. CONCLUSION

For the reasons stated, this Court DENIES Mr. Primus's Motion to Suppress Wiretaps and Derivative Evidence, ECF 450. A separate order follows.

Dated: June 24, 2024

                                                    /s/
                                    Stephanie A. Gallagher
                                    United States District Judge